**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT**

|  |  |
|---|---|
| RONALD CRESSY, | : |
| | : |
| Plaintiff, | : |
| | :     Case No. 2:12-cv-262 |
| v. | : |
| | : |
| KEVIN PROCTOR, | : |
| | : |
| Defendant. | : |
| | : |

## <u>Opinion and Order</u>

Plaintiff Ronald Cressy brings this action against his ex-romantic partner and alleged ex-business partner, Defendant Kevin Proctor.  Cressy asserts in a seven-count complaint that he has the right to real and personal property held by Proctor based on theories of partnership, express and implied contract, unjust enrichment, promissory estoppel, and quantum meruit.  He also asserts a right to half of Proctor's real property based on an express, resulting, or constructive trust.  Proctor has moved for summary judgment on all claims.  For the reasons set forth below, the Court **grants in part and denies in part** Proctor's motion for summary judgment, ECF No. 45.  Summary judgment is **granted** as to Count I (Partnership) and to Cressy's claims for equitable relief based on his household contributions, and **denied** with respect to Cressy's remaining claims.

1

BACKGROUND

**I. Personal Relationship between Cressy and Proctor**

Proctor met Cressy in 1993 and the two soon entered into a romantic relationship.  Cressy moved into Proctor's home in Long Beach, California, in May 1993.  In 1998, the two moved to Ryegate, Vermont, where they continued to live together until 2012.  During the course of their relationship, Cressy and Proctor never married, obtained a civil union, or registered as a domestic partnership.  They also never adopted wills or trusts for each other.  While the two were aware of and discussed the changes in the legal recognition of same-sex marriage, Proctor asserts that he declined Cressy's requests for a civil union or marriage.  However, they regularly used the term "partner" and "partnership" to describe their personal relationship.  This lawsuit concerns the distribution of their assets following the termination of their relationship in July 2012.

**II.    Alleged Business Partnership in Synergy**

Proctor began Synergy Advertising, Inc. ("Synergy"), in Long Beach, California, in 1990.  The business was founded and operated as a sole proprietorship.  At the outset of his relationship with Cressy, Proctor owned Synergy, his home (outright), and a sizeable collection of antiques.  He also held substantial personal savings.

2

When Proctor and Cressy first met, Cressy was on a mental health leave from his job with Carol Anderson, Inc., a women's clothing company.  For the first year or so of their relationship, the two shared living expenses.  In mid-Spring 1994, Cressy quit his job at Carol Anderson and Proctor began to support Cressy financially.  Around this time, Cressy started working part time at Synergy, primarily on billing and invoicing.  It is disputed whether Proctor specifically asked Cressy to help out or whether Cressy himself offered.  It is undisputed that Cressy never received formal compensation for his work at Synergy.  According to Cressy, this was a "mutual agreement" and he never requested that Proctor pay him for his work because the two were in a personal relationship and his initial contributions were not significant.  Even after his work became more substantial, Cressy says that he did not feel the need to ask for compensation based on an (unspoken) understanding that their business profits were shared and would be applied toward their joint household expenses.  This assumption — which Proctor disputes — forms much of the basis for this lawsuit.

While Cressy acknowledges that his work at Synergy was "volunteer" at the outset, the parties dispute how the nature of Cressy's work at Synergy evolved over time.  The scope of Cressy's contributions to Synergy is a matter of serious dispute

3

central to the outcome of this proceeding.  According to
Proctor, Cressy continued to work part time and never worked
more than 20 hours per week throughout his time at Synergy.
Moreover, Proctor stated in deposition that while Cressy worked
a "steady and reliable 20 hours [per week] in California," this
work became "much more sporadic" after they moved to Vermont.
Proctor categorized Cressy as a "helper," and his work as
"mostly clerical."  He also testified that Cressy's work was
unnecessary, that he was allowing Cressy to help out at Synergy
as a favor, and that Cressy worked out of "gratitude" for a
"roof over his head."  Proctor maintains that he never referred
to Cressy as his business partner in any context.

In stark contrast to Proctor's version of these events,
Cressy contends that his work at Synergy "evolved into a full-
time job" by summer 1994 after Janet Morrison, one of Synergy's
employees, left the business.  Morrison had been responsible for
numerous tasks and earned a salary of $40,000 per year.  Cressy
states that after Morrison left he took over her
responsibilities and began to work full time.  His duties at
Synergy expanded to include answering phones, sending invoices,
paying bills, processing orders, writing advertisements,
processing accounts payable, and preparing tax documents.  He
typically worked 40-50 hours a week, and at times in Vermont he
worked "a minimum" of 60 hours per week.  In fact, Cressy

submits that he worked more hours than Proctor by the time the two had moved to Vermont.  Cressy's account of his workload at Synergy has support from other sources.  For example, Proctor's sister-in-law, Trisha Proctor, also observed Cressy working up to 10-11 hours a day for Synergy.

Based on this increase in contributions, Cressy argues that he ultimately became a "partner" in the Synergy business and that Proctor referred to him as a "partner" in a business context on multiple occasions.  He states that he remembers at least one specific conversation in 1996 to this effect, and that Proctor made similar references to such a business partnership on later occasions.  As a result of these statements and the degree of his contribution, Cressy says he expected all of the profits of Synergy to be shared between them as partners.

### III.  Ryegate Property

In 1996, Proctor decided that he wanted to leave California and move to Vermont.  Over the following 18 months, Cressy began traveling with Proctor to New England to look at potential properties.  In 1998, Proctor selected and purchased a farm property in Ryegate, Vermont, using proceeds from the sale of his Long Beach home, his own personal savings, and profits from Synergy.  It is undisputed that Cressy made no individual financial contribution to the purchase of the property; however, because Proctor used Synergy profits to purchase the property,

5

Cressy submits that he indirectly contributed to the purchase through his uncompensated work at the business.

It is undisputed that Proctor was at all times the sole name on the title to the Ryegate property.  Proctor alone signed the offer, purchase and sale, and closing documents, and the deed ran only to Proctor.  However, as with Cressy's work at Synergy, the parties dispute significantly the nature of the ownership of the Ryegate property.

Cressy contends that he has an ownership right in the property.  According to Cressy, the two men made an oral agreement to title the property in both of their names, but he cannot identify any specific conversation to that effect, nor a witness to the agreement.  It is Cressy's general recollection that Proctor told him that he would take title solely in his name at the closing and then add Cressy on the title at a later time.  It is undisputed, however, that neither party ever mentioned this alleged agreement to anyone else, including Proctor's realtor on the sale.  Nonetheless, Cressy states that despite the titling, he "understood very clearly that [they] were buying this property together . . . that it was a joint purchase."

Proctor maintains in opposition that he never intended to share joint ownership of the Ryegate property with Cressy, and in fact, did not even initially plan to bring Cressy with him to

Vermont.  It is undisputed that Cressy was not present at the closing, though the two parties dispute the reason for this — Cressy says he was unable to attend because he was held up by obligations at Synergy, while Proctor contends that Cressy was in Boston doing "genealogy research."

After purchasing the farm in Ryegate, Proctor proceeded to purchase six additional adjoining properties over the three years following the initial sale.  Cressy is not on any of the titles for these properties, nor was there any discussion of putting him on the title to these additional tracts.  Cressy nonetheless contends that the two men referred to the property as "ours" and that the joint ownership was "understood by anyone that we had dealings with."  Proctor also amassed a large collection of antiques over the course of their relationship.  Cressy maintains that because these properties and antiques were purchased using proceeds from Synergy, he indirectly contributed to these purchases as he did the Ryegate property.  The two men moved to Ryegate in 1998 with Proctor's father and lived there together until 2012.  While living in Ryegate, it is undisputed that Cressy contributed to the household and farm chores, though the parties dispute the extent of the work he performed.

IV.    End of Relationship/Legal Proceedings

After moving to Vermont, Proctor continued to operate Synergy with help from Cressy, though the extent of Cressy's

work is again disputed.  Proctor wound down business operations
in Synergy in February 2008.  After terminating the business,
the parties lived off of Proctor's savings.  By 2012, these
savings had been depleted and Proctor asked Cressy to pay for
some household bills out of his own savings.[1]  Shortly after,
Cressy left Ryegate, and Cressy and Proctor's relationship ended
in July 2012 after nineteen years of cohabitation.  Cressy
attests that he left because the relationship was in a "hopeless
situation" and denied the assertion that he left because
Proctor's savings had run out.

Cressy brought this lawsuit against Proctor on the grounds
that after fourteen years of working at Synergy, Proctor
possessed all of their joint real and personal property.  On or
around November 23, 2012, Cressy filed a seven-count complaint
in this court, alleging that he is entitled to an equal share of
the partnership property on theories of express contract,
implied contract, imputed contract/unjust enrichment, promissory
estoppel, and quantum meruit.  Proctor filed a motion to dismiss
on December 26, 2012, which the Court denied in an Order dated
April 9, 2013, ECF No. 10.  Proctor has now filed a motion for
summary judgment seeking to dismiss all claims.

---

[1] It is apparent from the record that Cressy had significant assets of his own
when he began his relationship with Proctor.  It is undisputed that 2012 was
the first time Cressy contributed this money to shared expenses or purchases
(though Cressy states that he sometimes used his own finances for personal
purposes).

**DISCUSSION**

## I. Standard of Review

Before the Court is Proctor's motion for summary judgment. The Court may grant summary judgment only if Proctor shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing such a motion, the Court will view all of the facts and draw all inferences in the light most favorable to the non-moving party. *Howley v. Town of Stratford*, 217 F.3d 141, 150-51 (2d Cir. 2000).

## II. Partnership (Count I)

Cressy's first claim for relief is based on the theory that Cressy and Proctor carried on Synergy as co-owners and partners in the business, thereby entitling Cressy to an equal share of Synergy's assets. Under Vermont law, a partnership is formed by "the association of two or more persons to carry on as co-owners a business for profit, whether or not the persons intend to form a partnership." Vt. Stat. Ann. tit. 11, § 3212 (a). Thus, "[i]n deciding whether a partnership has been created by a tacit agreement, courts must examine the facts to determine whether

9

the parties carried on as co-owners of a business for profit."
*Harman v. Rogers*, 510 A.2d 161, 164 (Vt. 1986).  "An agreement
to share the profits and losses of an adventure is an essential
element of a partnership." *Raymond S. Roberts, Inc. v. White*,
97 A.2d 245, 248 (Vt. 1953).  Where the rights in question are
between the alleged partners only, "there must be a
manifestation of an intent to be so bound." *Harman*, 510 A.2d at
164.  This manifestation may be demonstrated by an express
agreement between the parties or inferred from their conduct and
dealings with one another. *Roberts*, 97 A.2d at 248.

It is undisputed that Proctor was the sole proprietor of
Synergy when Cressy began working there in 1994.  However,
Cressy asserts that the business morphed into a partnership over
the course of his time working there.  In support, he puts forth
evidence of both express and implied partnership.  Cressy first
alleges that Proctor *expressly* manifested an intent to form a
business partnership by stating on multiple occasions that
Cressy was his business partner.  Basically, Cressy recalls a
specific conversation from 1996 during which Proctor referred to
him as a "partner" in a business sense, and several other
instances in which he made similar references.

Cressy also argues that a partnership can be inferred from
the fact that the two pooled their property, labor, skills, and
experience in the business, and that Cressy was never paid any

10

salary for his work.  He also asserts that Synergy's profits went toward purchasing Cressy and Proctor's collective real and personal property (such as the Ryegate property and their antique collection) and that this demonstrates that the two were sharing in the profits and losses of the business.  However, it is undisputed that Cressy never invested his own money into the business, nor did he contribute individually to the purchase of any of their "shared" personal or real property.

These facts, even when viewed liberally in Cressy's favor, do not support a finding that the parties entered into a partnership.  It is not enough that Cressy devoted significant working hours to Synergy.  For a partnership to exist, Cressy needed to have authority and control over the business.  The undisputed facts indicate that Cressy never represented himself as an owner or principal of Synergy.  In all of the credit applications prepared on behalf the business, Proctor is named as the "sole proprietor," "owner," or "principal."  Cressy never invested in or lent his own money to Synergy.  He also never undertook any financial obligations on behalf of the business nor was he liable for any of its debts.  Other than the alleged reference to a partnership in 1996, Cressy does not assert that there was any agreement to split Synergy's proceeds and there is no evidence that the two men ever agreed to share their losses, thereby failing two "essential elements" of a partnership.

Furthermore, it is undisputed that Cressy did not have authority to represent Synergy in dealings with third parties. For example, Cressy never had nor does he allege that he had power to authorize payments on behalf of Synergy.  In his deposition, Cressy states that he was granted check-signing privileges at one point, but Proctor revoked them.  As Proctor persuasively points out in his motion for summary judgment, the fact that Proctor could "unilaterally rescind [Cressy's] check signing authority . . . stands as testament to who actually owned Synergy." Def.'s Mot. Summ. J. 13.  Finally, Cressy does not allege that Proctor ever referred to him as a partner beyond the conversation between the two of them alone in 1996.  Even assuming that Proctor did tell Cressy at one point that they were business partners, this conversation is essentially the only evidence that Cressy advances in support of his partnership theory.  It alone is not enough to establish a partnership under the law, and the Court therefore grants summary judgment to Proctor as to Count I.[2]

### III.    Express/Implied Contract (Counts II and III)

Cressy argues in the alternative that he is entitled to a share of Proctor's property pursuant to an express or implied

---

[2] As Synergy no longer exists as a company, any alleged partnership property would be a share of Proctor's real and personal property, the same relief Cressy seeks under his contract-based claims.  Thus, while Cressy may not proceed on his Partnership claim, he still will be able to seek a portion of Synergy's proceeds via his remaining claims.

contract.  The only difference between express and implied contract claims is the evidence used to establish the agreement between the parties.  *Peters v. Poro's Estate*, 117 A. 244, 246–47 (Vt. 1922).  An express contract is shown through spoken or written words; an implied contract "is to be inferred from the circumstances, the conduct, acts or relation of the parties rather than from their spoken words."  *Id.*  Cressy must also show a mutual expectation to be bound by the agreement.  *In re Boisvert's Estate*, 370 A.2d 209, 211 (Vt. 1977).  This mutual expectation can be demonstrated by "evidence of the circumstances under which these services were performed, the relative situations of the parties and their financial circumstances."  *Id.*

Cressy's contract claims are based on an express or implied agreement that Cressy would work for Synergy in exchange for an equal share of the profits earned and property acquired by the couple.  Cressy puts forth several facts to support this theory.  Cressy primarily asserts that a contract can be implied because he never received a paycheck for his — arguably substantial — work at Synergy.  Instead, all of the profits of the business went to their shared expenses and toward the purchase of the properties in Vermont.  According to Cressy, "[e]verything was paid for out of funds from the business" and that the two always referred to their real and personal property as "ours."  Cressy

therefore posits that instead of being paid for his services at
Synergy, it was mutually understood that his distribution would
be used to fund property to which he would have an equal claim.
Because all of their finances were managed together, Cressy
argues that there was a reasonable inference of "an agreed-upon
equal interest in Synergy's proceeds."  Pl.'s Opp'n Mot. Summ.
J. 17.

Proctor nonetheless argues that summary judgment is proper
because Cressy cannot demonstrate any "intent to be bound" to
support an express or implied contract.  At summary judgment,
the Court must make all inferences in favor of Cressy.  While
Cressy does not provide enough evidence to sustain an express
contract finding, there is enough support on the record to
support a reasonable inference that an implied contract arose
between the parties.  Summary judgment is therefore denied as to
Counts II and III.

## IV.    Equitable Claims (Counts IV-VI)

Counts IV through VI assert equitable grounds for relief as
alternatives to Cressy's partnership and contract claims on the
theories of unjust enrichment, promissory estoppel, and quantum
meruit.

### a. Unjust Enrichment (Count IV)

Cressy's first equitable ground for relief arises under a
theory of unjust enrichment.  "Under a quasi-contract theory of

14

unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable." *Brookside Memorials, Inc. v. Barre City*, 702 A.2d 47, 49 (Vt. 1997). "[T]he inquiry is whether, in light of the totality of the circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered." *Legault v. Legault*, 459 A.2d 980, 984 (Vt. 1983) (citations omitted). Cressy asserts multiple bases for his unjust enrichment claim, namely, that he put in extensive hours without pay at Synergy and made significant contributions to the Ryegate property. He thus argues that it would be inequitable for Proctor to retain the value of his as-yet uncompensated work. According to multiple testimonials, Cressy spent a significant amount of time working for Synergy — sometimes up to 10 or 11 hours per day. Assuming this is true (as the Court must when assessing Proctor's motion), this means that Cressy provided substantial free labor to Synergy. Because Proctor was Synergy's sole proprietor, the benefit of this free labor ran directly to Proctor. Thus, Proctor indubitably received a benefit from Cressy's contribution to his business such to satisfy the first element of an unjust enrichment claim.

The question therefore becomes whether such benefit has been *inequitably retained* by the defendant. The Court makes this determination in light of the totality of the

circumstances; "whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction" and instead requires a "realistic determination based on broad view of the human setting involved." *Id.* at 984 (quotations omitted).  It is undisputed that Cressy was not paid (at least in a traditional sense) for his contributions to Synergy.  However, Proctor argues that these benefits were not inequitably retained because Cressy received considerable recompense in return for his work — Proctor paid for Cressy's lodging, expenses, entertainment, and meals.  However, there are significant facts in dispute that preclude the Court from awarding Proctor summary judgment on Cressy's unjust enrichment claim.  While Proctor alleges that Cressy was rewarded for his contributions at Synergy, the extent — and therefore necessarily the value — of his work is disputed.  Furthermore, while it is undisputed that Proctor paid for many of the couple's expenditures, it is disputed whether the parties treated the property purchased with Synergy profits as joint property. Thus, it is impossible to determine at this juncture whether Cressy received "compensation" from Proctor commensurate with the benefits Proctor obtained from Cressy's work.  Thus, based on the current record, it cannot be established as a matter of law whether Proctor retained the benefits of Cressy's work at

Synergy in an inequitable manner, and Cressy's unjust enrichment claims survive Proctor's motion for summary judgment.

In addition to his work at Synergy, Cressy also argues that he should receive equitable relief based on his contributions to the Ryegate property.  While Cressy's unjust enrichment claims regarding his work at Synergy may proceed, this second theory fails.  Cressy states that he spent a full day every week working on the property, including mowing, maintenance, fence repair, and the like.  Even assuming this to be true Cressy's household contributions cannot form the basis of an unjust enrichment claim, because

> [o]rdinarily, where services are rendered and voluntarily accepted, the law will imply a promise upon the part of the recipient to pay for them; but where the services are rendered by members of a family, living as one household, to each other, there will be no such implication from the mere rendition of services. . . . The reason for this exception to the ordinary rule is, that the household family relationship is presumed to abound in reciprocal acts of kindness and good-will, which tend to the mutual comfort and convenience of the members of the family, and are gratuitously performed.

*Sullivan v. Delisa*, 923 A.2d 760, 769-70 (Conn. 2007) (quotations omitted).  Courts in Vermont have applied a similar presumption to find that "when individuals stand to each other in a family relation . . . the law implies no contract for wages." *Davis v. Goodenow*, 27 Vt. 715, 719 (1855).  In this case, it is undisputed that Cressy contributed to household

17

maintenance at Ryegate—perhaps significantly — but he also received the benefits of these contributions, as he lived on the property throughout the duration.  Thus, there is no evidence that these benefits were inequitably retained by Proctor and the Court will not allow these acts to form the basis of Cressy's unjust enrichment claim.

### b. Promissory Estoppel (Count V)

Cressy also seeks equitable relief under a promissory estoppel theory.  To prevail on a claim of promissory estoppel, the plaintiff must show that (1) defendant made a promise to the plaintiff; (2) that the defendant should have reasonably expected that the promise would induce action or inaction by the plaintiff; (3) that the promise actually did induce action or inaction; and (4) that justice requires enforcement of the promise.  *Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 799-800 (Vt. 2000).  "In determining whether a plaintiff reasonably relied on a defendant's promise, courts examine the totality of the circumstances." *Id.*  In support of his promissory estoppel claim, Cressy asserts that Proctor made "numerous specific promises" to him that their accumulated earnings and property would be shared equally in exchange for Cressy's contributions to Synergy, and that he relied on these promises to his detriment.  He submits that such a promise would provide sufficient inducement for him to work without pay for

18

many years, and that the fact that he did so demonstrates that
he actually relied on this promise.

In his motion for summary judgment, Proctor contends that
Cressy's promissory estoppel claim should fail because Cressy
cannot demonstrate any promise.  It is certainly disputed
whether Proctor actually made such a promise; however, this
dispute does not support summary judgment in Proctor's favor.
Instead, it is reasonable to infer that Proctor's references to
"our" home and "our" business could have led Cressy to believe
that such a promise existed and to reasonably rely on it.
Further, a reasonable jury could find that, assuming such a
promise actually occurred, the promise *did* induce such action,
as Cressy worked for Synergy for fourteen years without a
salary.

Proctor also argues that, even if there was a promise,
Cressy did not rely upon said promise to his detriment because
"[Cressy has not alleged that he gave anything up to work at
Synergy." Def.'s Mot. Summ. J. 20.  However, again viewing the
facts in the light most favorable to Cressy, it is certainly
reasonable to infer that working 50 to 60 hours a week without
pay (as Cressy alleges) constitutes a detriment.  Viewing the
facts in the light most favorable to Cressy, a reasonable jury
could find that Cressy relied on Proctor's promise to share in
the profits of Synergy and that this reliance induced him to

19

work there without a salary to his ultimate detriment.  Thus, the Court denies summary judgment as to the promissory estoppel claim.

### c. Quantum Meruit (Count VI)

Cressy's final equitable claim arises under a theory of quantum meruit.  Quantum meruit allows a plaintiff to "receive the reasonable value of his services where he justifiably relied on the defendant's request for those services regardless of whether the defendant received a benefit." *In re Estate of Elliot*, 542 A.2d 282, 286 (1988).  Under Vermont law "the distinction between [unjust enrichment and quantum meruit] lies not in the alleged wrong committed by the defendant but rather in the measure of recovery for that wrong." *DJ Painting, Inc. v. Baraw Enters., Inc.*, 776 A.2d 416, 416 n.2 (2001).  Thus, the issues underlying the Court's unjust enrichment analysis apply equally in the quantum meruit context, and summary judgment is denied for the same reasons.[3]

Proctor argues that Cressy's quantum meruit claim should fail because he never requested that Cressy work for him; Cressy himself confirmed that he did not "remember a specific conversation" to this effect and that he "may have volunteered" because he was available after he left his job at Carol

---

[3] Quantum meruit and unjust enrichment are therefore not distinct causes of action and instead simply contemplate different measures of damages for the same harm.  If this action is to go before a jury, Cressy would not be permitted to recover on both claims.

Anderson, Inc.  Proctor therefore states that because Cressy himself acknowledges that he began his work at Synergy as a volunteer, he cannot demonstrate that he relied on "defendant's request for [his] services" such to support a quantum meruit claim.  However, if the facts are as Cressy contends — if Cressy was really contributing 10-11 hours per day of work for Synergy — a jury could reasonably infer that Proctor requested and wanted Cressy's labor, and that if he had not wanted it, he would have informed Cressy of this fact.  As a result, it would also be reasonable to infer that Proctor benefitted from Cressy's uncompensated labor.  Again, as the valuation of Cressy's labor remains in dispute, the quantum meruit claims cannot be decided at summary judgment.

**V. Additional Claims Related to Real Property (Count VII)**

In Count VII, Cressy asserts his right to a one-half interest in the Ryegate property based on theories of express, resulting, and constructive trusts.  For largely the same reasons as the equitable relief claims, none of Cressy's trust theories can be decided at summary judgment.

An express trust is created by a specific intent to create such a trust.  *Savage v. Walker*, 2009 VT 8, ¶ 8, 969 A.2d 121, 124.  In support of his express trust claim, Cressy asserts that he and Proctor made an express oral agreement that the property would be titled jointly, and the only reason this did not occur

21

was because Cressy was unable to attend the property closing.
He also alleges that the property was purchased with significant
funds from Synergy, and thus from Cressy's uncompensated work.
In opposition, Proctor denies that he ever indicated to Cressy
that he had a right to a share of the Ryegate property, noting
that the majority of the funds used to purchase the property
came from the sale of his home in Long Beach, not from Synergy.
However, because the Court must make all inferences in Cressy's
favor at this juncture, it cannot be determined as a matter of
law that no express trust existed here.

Cressy also argues that he is entitled to relief based on a
constructive trust theory.  A constructive trust is an equitable
remedy imposed by a court to prevent one party from being
unjustly enriched at the expense of another.  *Savage*, 2009 VT 8,
¶ 8, 969 A.2d at 124.  A constructive trust is thus essentially
another form of unjust enrichment, and is controlled by the same
considerations.  Cressy's constructive trust claim is premised
on the same theory underlying his Unjust Enrichment claim under
Count IV—that Proctor was unjustly enriched by Cressy's unpaid
work at Synergy.  Cressy argues that because the profits of his
unpaid labor went toward the purchase of the Ryegate property—a
fact that remains in dispute—it would be unjust to allow Proctor
to retain full ownership of the property.  Because triable
issues remain as to Cressy's theory of unjust enrichment

regarding his work at Synergy[4] and as to the source of the funds used to purchase the Ryegate property, Cressy's constructive trust claim cannot be decided at summary judgment.

Cressy's final real property claim is based on a resulting trust theory.  A resulting trust arises by operation of law when one person purchases real property with his or her own funds and the property is deeded in another person's name. *Gregoire v. Gregoire*, 2009 VT 87, ¶ 15, 987 A.2d 909, 912 (citing *Pinney v. Fellows*, 15 Vt. 525, 538 (1843)).  Under a resulting trust, the legal owner of the property holds title for the use and benefit of the individual who furnished consideration for the property. Again, because it is disputed whether the funds used to the purchase the property belonged to Proctor alone or were jointly owned, it cannot be determined as a matter of law whether or not a resulting trust existed here.

Proctor nonetheless argues that all three trust claims should fail on the basis of laches.  "Laches is the failure to assert a right for an unreasonable and unexplained period of time when the delay has been prejudicial to the adverse party, rendering it inequitable to enforce the right." *Chittenden v. Waterbury Center Community Church, Inc.*, 168 Vt. 478, 494 (1998).  In support of his laches argument, Proctor points out

---

[4] However, as with Cressy's Unjust Enrichment claim under Count IV, Cressy's household contributions to the Ryegate property (farm work, etc.) cannot support his constructive trust claims, and Cressy may not proceed on this theory on Count VII.

that while Cressy claims to have relied on Proctor's promise to fix the title to the property, he did not discuss changing the title at any point in the following fourteen years, and that this delay should preclude Cressy from asserting title now.

Proctor's laches theory cannot prevail at summary judgment because it remains disputed whether Cressy's delay was unreasonable and whether it was prejudicial to Proctor. First, a jury could find that Cressy had a reasonable excuse for not asserting his right to the Ryegate property earlier. He was in a relationship with Proctor for the duration of the delay and the two lived in the house together. As a result, Cressy could have reasonably believed that there was no reason to assert his rights earlier than he did. Second, it is disputed whether this delay caused any prejudice to Proctor. *See Stamato v. Quazzo*, 139 Vt. 155, 157 (1980) (the defense of laches does "arise from delay alone, but from delay that works disadvantage to another"). Proctor asserts that he was prejudiced by such delay because, following Cressy's departure from Ryegate, Proctor took out a home equity line of credit based on the understanding that the title was his alone; any change to this and Proctor could face admonition for misrepresenting the title to the lender. However, the facts indicate that Proctor took out this line of credit *after* Cressy filed this suit, and therefore it may be disingenuous for him to base his assertion of prejudice on this

24

factor.  Because reasonable jurors could disagree about whether the delay was unreasonable or prejudicial, the doctrine of laches does not preclude Cressy's trust claims.  As a result, the Court denies Proctor's motion for summary judgment as to Cressy's express, constructive, and resulting trust claims.

**CONCLUSION**

For the reasons stated above, the Court **grants in part and denies in part** Proctor's motion for summary judgment.  Summary judgment is granted with respect to Count I and this count is dismissed.  Summary judgment is also granted in part as to Cressy's claims for equitable relief—these claims may proceed based on Cressy's contributions to Synergy, but not based on his theory of household contributions to the Ryegate property. Summary judgment is denied with respect to all remaining claims.

DATED at Burlington, in the District of Vermont, this 21st day of May, 2014.

/s/William K. Sessions III<br>William K. Sessions III<br>District Court Judge