RONALD CRESSY,                    :
                                  :
          Plaintiff,              :
                                  :
     v.                           :          Case No. 2:12-cv-262
                                  :
KEVIN PROCTOR,                    :
                                  :
          Defendant.              :

## Opinion and Order

Plaintiff Ronald Cressy ("Cressy") initially brought seven claims against Defendant Kevin Proctor ("Proctor"): (I) Partnership, (II) Express Contract, (III) Implied Contract, (IV) Imputed Contract/Unjust Enrichment, (V) Promissory Estoppel, (VI) Quantum Meruit, and (VII) Additional Claims Related to Real Property. ECF No. 1. The Court granted summary judgment to Proctor on Counts I and II as well as the express trust claim portion of Count VII. *See* ECF No. 55, 64. Cressy's claims for unjust enrichment (Count IV) and quantum meruit (Count VI) are not distinct causes of action but rather different measures of damages for the same harm. ECF No. 55 at 20 n.3. At the beginning of trial, counsel for Cressy explained that, in addition to his claims for implied contract and promissory estoppel, Cressy would be seeking damages under the theory of quantum meruit and not unjust enrichment. ECF No. 93 at 8-9.

He also conceded that Cressy's additional claims related to real property in Count VII depended on succeeding in either the implied contract claim (Count III) or the promissory estoppel claim (Count IV). *Id.* at 9. Proctor's Answer presented affirmative defenses and alleged three counterclaims: (I) Tortious Conversion of Property, (II) Tortious Conversion of Cash, and (III) Quantum Meruit. ECF No. 12.

The Court conducted a bench trial that began on April 27, 2015 and concluded on May 1, 2015. Based on the testimony of witnesses, all of the evidence submitted, and arguments of counsel, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. In brief, the Court rules in favor of Cressy on his quantum meruit claim (Count VI) but rules in favor of Proctor on all of Cressy's remaining claims. The Court rules in favor of Cressy on all of Proctor's counterclaims. The Court will enter judgment consistent with its conclusions and award Cressy damages in the amount of $173,685.

## I. Findings of Fact

The Court heard live testimony from several witnesses in open court and read the stipulated deposition transcripts of others. The Court also reviewed the trial exhibits. There are many sharply disputed factual questions, particularly with respect to the parties' personal relationship. On many

occasions, one witness's testimony completely contradicted another's account. Not every factual dispute was equally important, however. The Court limits its factual findings to those that are relevant to its conclusions of law.

**A. The Early Years**

Proctor began Synergy Advertising ("Synergy") in Long Beach, California in 1990. The business was founded and operated as a sole proprietorship. Synergy's primary business was recruitment advertising and its largest client was (and remained) Apria Healthcare. At one point in the early 1990's Synergy had five employees: Proctor, who focused primarily on business development and client relations; Janet Morrison, who performed a number of functions including billing, account coordination, and sales; an account coordinator; an artist; and a clerical worker. The number of people working for Synergy fluctuated over time and some employees worked only a part-time schedule. Throughout the life of the business, Proctor required his employees to answer the phone whenever possible rather than allow a call go to voicemail. Proctor operated Synergy out of his den in the early years but eventually moved the Synergy office to the garage of his Long Beach property.

Meanwhile, Cressy worked for a women's clothing company, Carol Anderson, Inc., from 1976 to 1994. Cressy was the operations manager and, in that capacity, oversaw the warehouse,

purchased raw materials, scheduled production, organized contractors, developed new computer systems as technology became available, and supervised as many as twenty other employees in the warehouse. At the peak of his tenure there he earned a substantial salary, more than $90,000.

Prior to meeting Proctor, Cressy was married from 1988 to December of 1993. His marriage ended when he came out to his then wife and she filed for divorce. During the divorce process, Cressy cashed out his retirement savings and paid off some of his debts. Afterwards, Cressy had approximately $15,000 in cash left over plus two vehicles, which he later sold for a total of approximately $9,000. Cressy used these savings to pay for some of his personal expenses and occasionally to pay for meals early in his courtship with Proctor.

Cressy and Proctor began their romantic relationship in 1993. Because Cressy's living situation was somewhat uncertain in the wake of his divorce, Cressy moved into Proctor's Long Beach home in mid-1993. Soon after, Cressy took paid mental health leave from Carol Anderson for approximately six months. He eventually quit in 1994 and took some time off to recuperate. At the time Cressy moved in, Proctor owned Synergy, his home (without a mortgage), and a collection of antiques. He also held substantial personal savings.

The two continued their romantic relationship for nearly two decades. Cressy and Proctor considered themselves domestic partners and a family. They stayed together out of love and affection but Proctor supported Cressy financially throughout their entire relationship.

**B. Cressy Begins to Work for Synergy**

Eventually Cressy and Proctor developed a professional relationship in addition to their personal relationship. After moving in with Proctor, Cressy began working for Synergy on a part-time basis, initially as a volunteer. However, his role changed over time and his responsibilities began to increase significantly after Janet Morrison left in 1994. Ms. Morrison was a full-time employee and earned approximately $40,000 per year. Her compensation included about $10,000 in commissions she received for bringing in new clients. Ms. Morrison trained Cressy before she left. While she was still employed at Synergy Proctor made all the decisions about how Synergy operated.

After Ms. Morrison left, Cressy began answering phones, handling payables, sending invoices, receiving and organizing tear sheets from newspapers, and handling receivables. Over time, Cressy also took on account coordinator responsibilities, including taking orders from customers, getting quotes from newspapers, placing ads, reviewing previous ads prepared for a client, and researching publications for placing ads. At some

point Cressy also began to handle preparing the documents necessary to file Synergy's taxes.

Traci Wilson-Kleekamp, a Long Beach neighbor of Proctor, worked for Synergy part time after Ms. Morrison left. She and Cressy were the only employees aside from Proctor during her involvement with the business. Ms. Wilson-Kleekamp did not typically participate in the day-to-day operations but rather performed various research projects at Proctor's request. She often worked from her own home nearby because she had exclusive use of the phone line there for internet research. Because she had small children, Ms. Wilson-Kleekamp's hours decreased in 1996 and 1997 and she rarely came into the Synergy office after that. She did not, therefore, have the opportunity to regularly observe Cressy's hours in the office. However, at times she heard Cressy refer to Proctor as the "owner" when he answered the phone and observed him logging checks, opening the mail, and faxing insertion orders.

### C. The Move to Vermont

In 1996 Proctor decided that he wanted to leave California for a variety of reasons. The Court is persuaded that, contrary to Proctor's assertion that Cressy "begged" him to take him to Vermont, Proctor always intended to take Cressy with him and considered Cressy's views in selecting their new home. *See* ECF No. 96 at 64. Over an eighteen month period, Cressy and Proctor

traveled to New England together look at potential properties. Judy Cashman, Proctor's real estate agent, testified that Cressy was with Proctor every time they met but that only Proctor was her customer. Neither of the two told Ms. Cashman that Cressy would be a buyer or would be included on the title.

In 1998 Proctor selected and purchased a farm in Ryegate, Vermont using proceeds from the sale of his Long Beach home, his own personal savings, and profits from Synergy. Cressy made no individual financial contribution to the purchase of the property and only Proctor's name is on the title. Proctor signed the offer, purchase and sale, and closing documents, and the deed ran only to Proctor. Cressy was not present when the closing documents were signed.

Cressy's testimony that Proctor promised to put his name on the title later is not credible in light of Ms. Cashman's testimony. If Proctor had intended to include Cressy on the title it seems likely that he would have expressed this intention in some way to Ms. Cashman. Moreover, such an arrangement would be inconsistent with the exclusive control Proctor wielded over the couple's finances and Synergy's profits.

Cressy and Proctor moved to the new property over Labor Day weekend of 1998. Prior to moving the two threw out a significant amount of Synergy records. The rest of the records

were, for the most part, moved into the home office at the
Ryegate property.  The office was on the second floor and stairs
connected the office to the kitchen.

After purchasing the farm in Ryegate, Proctor eventually
purchased six additional adjoining properties over the three
years following the initial sale.  Cressy was not included on
any of the titles for those properties.  While Proctor may have
referred to the collection of properties he purchased as "ours"
in front of Cressy, Proctor never intended to give Cressy a one
half interest in the property.  The assessed value of the all of
the parcels is $967,000.  Cressy's real estate expert, Sal
DeMaio, estimated the market value of the entire property is
$1,500,000.

While in Ryegate, Cressy also spent a significant amount of
time helping with farm chores including mowing the lawn, tending
to the horses, mending the fences, plowing snow, and other
necessary tasks.  Cressy also posted signs around the property
to forbid hunting and fishing that included only Proctor's name.
Proctor participated in the farm responsibilities as well.

At some point Cressy moved Synergy financial records from
the house to the main barn next to the house.  Eventually
Proctor moved these records to the other house on one of the
later-purchased properties known as "Sunnyside."  Sunnyside
burned down in 2011 and the fire destroyed Synergy financial

records as well as other personal property.  Proctor told a neighbor, Nessa Flax, that he was concerned about all the records that had been lost at the time the house was still smoking.

### D.  The End of Synergy and the Relationship

From the time of the move to Vermont, the only two full-time Synergy employees were Cressy and Proctor.[1]  The business moved towards more of an online model but still did a significant amount of newspaper advertising.  Eventually Proctor's father became ill and moved to the Ryegate property. Proctor took primary responsibility for his care and so Cressy took over many more to all of the responsibilities for the business during that time, approximately in 2004.

Proctor wound down Synergy's business operations in February of 2008.  After terminating the business, Proctor and Cressy lived off of Proctor's savings and Synergy funds.  By 2012, these reserves were depleted and Proctor asked Cressy to pay for some household bills out of his own savings.  Shortly after, Cressy left Ryegate and their relationship ended after nineteen years of cohabitation.

---

[1] Proctor's sister, DeAnn Proctor Riley, performed limited clerical work on a volunteer basis while temporarily living in the guest house.  There was no other significant source of outside labor.

Even using the conservative assessed value of the parcels Proctor owns and conservative estimates of the antiques, farm equipment, and other personal property in his possession, Proctor's total assets are worth well over $1 million. A substantial portion of Proctor's personal and real property were purchased with Synergy funds. When Cressy left he had less than $500 in his bank account and no other assets.

During the course of their relationship, Cressy and Proctor never married, never obtained a civil union, and never registered as a domestic partnership, nor did they ever adopt wills or trusts for each other. While the two were aware of and discussed changes in the legal recognition of same-sex marriage, Proctor declined to marry Cressy when Cressy asked after marriage became legal in Vermont. Proctor did make Cressy the beneficiary of a small IRA when Cressy told Proctor that he was feeling insecure about his financial position but this was the only time Proctor made any provision for Cressy.

After Cressy left Ryegate, Proctor took out a Home Equity Line of Credit ("HELOC") loan for $75,000. Apart from this loan Proctor has had no new sources of income since Cressy left. Cressy has been working part-time for a friend's travel agency and lives with his parents in California.

### E. Proctor's Counterclaims

Proctor alleges that Cressy took a particular painting and cash from Proctor's closet at some point before he moved out. Cressy denied taking the painting. Even by Proctor's own admission, however, Proctor did not discover the painting was potentially missing until October of 2012. The painting had been moved around the house over the years and in the approximately three-month period between the time Cressy left and Proctor discovered its absence any number of things could have happened to it. Moreover there are no facts in the record to suggest Cressy took it other than that he had previously admired the painting in question.

Cressy also denies taking the cash. He did not know about Proctor's cash in the closet, only the cash Proctor kept in the desk. Proctor did not keep any kind of record with respect to his closet cash. The Court is persuaded that the more likely explanation for any purported discrepancy is that during the emotionally charged period after burying his parents Proctor simply forgot that he spent the money or misremembered the amount he previously had secreted away.

### F. Cressy's Work for Synergy Was Full-Time

The central factual dispute in this case is the nature of Cressy's work for Synergy. Proctor contends that Cressy never worked more than 10 to 20 hours a week and was always purely a

volunteer. Cressy maintains that he worked at least 40 and perhaps as many as 60 hours some weeks with the expectation that he would receive one half of the business's assets, including the properties purchased with Synergy funds. The Court is persuaded that beginning in 1994 when Ms. Morrison left, Cressy was a full-time employee and by the time the two moved to Vermont he ran a significant portion of Synergy's day-to-day operations.

To begin with, the number of other employees at Synergy decreased from five at the company's peak to only the two parties by 1998 while the business nevertheless continued to bring in substantial sums. The amount paid to employees shrank from $32,000 in 1996 to $17,689 in 1997 to zero in 1998. Ex. 19, 2, 3. Meanwhile, Synergy continued to bring in a substantial amount of net income, reaching as high as $310,473 in 1999 when the only employees were Cressy and Proctor. While the financial records are incomplete, gross revenue in both 1997 and 2000 was well over $2,000,000 and over $1,000,000 in every other year apart from 2006. Proctor testified that he had more than one year in which gross revenues were greater than $3 million and Cressy confirmed that one of those years was while they were in Vermont.

Cressy performed the account coordinator function, which was previously handled by a separate employee. He also

performed clerical work of the type Proctor's sister, DeAnn Proctor Riley, occasionally performed when she was living on the Ryegate property temporarily. This clerical work required at least 10 to 15 hours per week. Consistent with Proctor's policy of preventing phone calls from going to voicemail whenever possible, Cressy was responsible for answering the phone. He therefore was required to stay near the office during business hours. When answering, Cressy had significant interaction with customers, including taking orders for new advertisements. Testimony from Trisha Proctor backed up Cressy's account that he worked full days as well as some weekends and was responsible for answering the phone. Ms. Proctor lived on the Ryegate property and had the opportunity to observe Cressy's work habits because the office was connected to the kitchen where the family would gather for dinner. Finally, testimony by Cressy's brother, Alan Cressy, also confirmed that Cressy's daily schedule was similar to what Ms. Proctor described. Even during Alan Cressy's infrequent visits planned well in advance, Cressy was still unable to take an entire day off on some occasions because the business needed attention. Proctor himself acknowledged that he began to work less when his father's health began to decline. It is clear that Proctor would not have been able to sustain the high level of business Synergy continued to

do if Cressy had been working only a small amount of hours doing volunteer clerical work.

According to Cressy, at some point in 1996 Proctor told him that he considered Cressy to be a partner in the business and that it was clear from context that the conversation referred to their professional relationship. However, Proctor had a very different view of the situation. Proctor claims Cressy was essentially an indentured servant working purely out of gratitude for the roof over his head. In his mind "Synergy was at that time and always a sole proprietorship." ECF No. 95 at 61.

Proctor owned and controlled the bank accounts as well as every aspect of the couple's financial situation. Although Cressy temporarily had check signing authority from 1998 to November of 2000, Proctor took the privilege away. Proctor believed that Cressy made unauthorized purchases and described Cressy's actions as "embezzlement." ECF No. 95 at 112. Even though Proctor maintained control he nevertheless accepted the benefits of Cressy's significant unpaid work. Proctor did not believe that he was "doing Ron a favor" by letting Cressy work for him. ECF No. 96 at 53. Proctor also agreed that most of Cressy's work was very acceptable and that he benefitted from it. *Id.* at 54-55.

Cressy testified that he was glad to help Proctor out and it was a "natural thing" for him to help out with his "partner's business." ECF No. 93 at 215. By the time he became a full-time employee, however, it was understandable that he expected to receive some benefit for his labor other than room and board.

In fact, Cressy never received any compensation for his work at Synergy. The parties dispute whether, from a tax perspective, it was prudent or imprudent to refrain from paying Cressy a salary. The Court is not in a position to analyze the tax consequences of Proctor's choice. The dispute is ultimately irrelevant because the Court is persuaded that, regardless of the reason why, Cressy contributed a significant amount of labor to Synergy without pay and with a reasonable expectation that he was building something with Proctor for their mutual benefit.

Even though Cressy was in a precarious financial situation, he never confronted Proctor to insist that he be paid or to disrupt his assumption that the business would ultimately be shared because of Proctor's "very strong personality." ECF No. 94 at 221. Cressy, more timid and quiet, tended to avoid confrontation. ECF No. 97 at 35. While Cressy might have spared himself some surprise and disappointment by confronting Proctor earlier and clarifying whether Proctor had the same expectations, it appears to be consistent with the nature of

their relationship for Cressy to defer to Proctor and avoid raising potentially controversial topics.

### G. The Antique Collection

Proctor had a collection of antiques before the two began their relationship but they often took weekend trips to purchase antiques together. They gradually increased their collection with Synergy funds. Collecting became a shared project and Proctor and Cressy referred to the collection they amassed since the time Cressy moved in as "ours."

Cressy's brother Alan went on antique shopping trips with Cressy and Proctor. He testified that Proctor told him "some people put money in the bank and we buy antiques. It's more fun." ECF No. 93 at 58. Alan Cressy had the impression that the antiques were for "investment purposes." *Id.* at 59. Cressy also testified that Proctor told him "these [antiques] are our retirement." ECF No. 94 at 49.

Cressy and Proctor intended to begin a new business selling antiques after Synergy closed and took some steps to do so. They already had a substantial inventory built up. They both were excited about the possibility of an antique business. Proctor got a resale license through the State of Vermont so he could acquire antiques specifically for the business in the future without paying sales tax. However, the business never got started.

## II. Conclusions of Law

### A. Implied Contract (Count III)

As the Court previously described, Count III is a claim for a contract implied in fact. ECF No. 64 at 4. It asserts that an actual contract existed between the parties. *Id.* Such a contract is "implied in the sense that the fact of the meeting of minds is inferred." *Morse v. Kenney*, 89 A. 865, 866 (Vt. 1914). The contract "is to be inferred from the circumstances, the conduct, acts or relation of the parties rather than from their spoken words." *Peters v. Poro's Estate*, 117 A. 244, 246-47 (Vt. 1922). Cressy must also show a mutual expectation to be bound by the agreement. This mutual expectation can be demonstrated by "evidence of the circumstances under which these services were performed, the relative situations of the parties and their financial circumstances." *In re Boisvert's Estate*, 370 A.2d 209, 211 (Vt. 1977). The defendant's assent, however, is necessary to prove such a promise. *Morse*, 89 A. at 866.

Here, Cressy's claim fails because, despite his own view of their arrangement, there was simply no mutual expectation to be bound between the parties. As the Court concluded above, Cressy worked a significant amount for Synergy and was never compensated. All of the profits from the business were spent on shared household expenses and the purchase of the Vermont properties. Cressy claims, therefore, that he and Proctor had

impliedly agreed that he would receive an equal share of the profits earned and property acquired. However, it is clear from Proctor's testimony and contemporaneous behavior that Synergy remained a sole proprietorship under his singular command.

Proctor was in exclusive control of Synergy's purse strings and, by extension, the couple's shared finances. The couple never shared a bank account. Proctor testified "there was just never any authorization to buy anything, certainly not without my permission or without telling me that it was needed or something or asking me if it was okay." ECF No. 95 at 108. Although Proctor briefly gave Cressy check signing privileges, he withdrew them when Cressy began spending money without Proctor's explicit authorization. Proctor responded with accusations, including "how dare you[?]" and referred to this episode as "embezzlement." ECF No. 98 at 113. Clearly Proctor's behavior did not evince an intention to give Cressy half of the business. Proctor did not even give Cressy his own credit card until Proctor's father could no longer drive to retrieve household items, many years into their relationship.

Aside from a single conversation in 1996 in which Cressy inferred from context that Proctor considered him a "partner" in business, Cressy could not to point to any specific words or patterns of behavior that supported his perception of their purported arrangement. Cressy's impression of the "general

course of business" the couple shared that was "established and known between both" is not sufficient to support a finding of mutuality necessary to sustain a claim for implied contract. ECF No. 94 at 150.

Moreover, there is simply no evidence other than Cressy's testimony that Proctor ever intended to give Cressy a one-half share of his real property. Cressy's name appears nowhere on any important legal document related to the property and Ms. Cashman had no inkling that anyone other than Proctor was to be the buyer.

Finally, the Court is persuaded that Proctor never intended to give Cressy one half of the antiques and never considered them shared property. Therefore Cressy is not entitled to half of the antiques.

Accordingly, the Court finds in favor of Proctor on Count III.

## B. Promissory Estoppel (Count V)

To prevail on a claim of promissory estoppel, the plaintiff must show that (1) defendant made a promise to the plaintiff; (2) that the defendant should have reasonably expected that the promise would induce action or inaction by the plaintiff; (3) that the promise actually did induce action or inaction; and (4) that justice requires enforcement of the promise. *Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 799-800 (Vt. 2000).

In other words, the promisee must have detrimentally relied on the promise. *Id.* at 800. "In determining whether a plaintiff reasonably relied on a defendant's promise, courts examine the totality of the circumstances." *Id.*

The Court need not progress beyond the first element of the claim because Cressy has not demonstrated that Proctor promised to share one half of the proceeds of Synergy's business or one half of his property. Even if Proctor did tell Cressy that he considered him a "partner" in a business context on one occasion, that statement does not rise to the type of promise necessary to support a claim for one half of the business. The word "partner" is ambiguous and absent factual context other than Cressy's "understanding" or gut feeling, this word cannot bear the weight that Cressy would have the Court assign it. Nor does this single word contain a promise. Cressy agreed on cross examination that apart from that conversation in 1996, Proctor never explicitly agreed to reward Cressy's work with fifty percent of Proctor's assets.

Other references to "our business" likewise do not constitute a promise to pay. Possessive pronouns are simply a fact of linguistic convenience when one works closely with someone else on a shared enterprise. If every business owner who referred to "our" business in front of her employees thus

impliedly promised to share one half of the proceeds, chaos would ensue.

Accordingly, the Court finds in favor of Proctor on Count IV.

### C. Quantum Meruit (Count VI)

Quantum meruit is an equitable remedy that is sometimes described as "constructive" or "quasi" contract. *See Morse*, 89 A. at 867. Unlike Count III, there is no actual meeting of the minds. Instead the contract is implied in law and the intention of the defendant is irrelevant. *Id*. ("[T]he law infers the promise without reference to the intention of the party, and often against his express dissent, when he is under legal obligation, paramount to his will, to perform some duty."). Such claims are "based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable." *DJ Painting, Inc. v. Baraw Enterprises, Inc.*, 776 A.2d 413, 417 (Vt. 2001). The proper inquiry is "whether, in light of the totality of circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered." *Legault v. Legault*, 459 A.2d 980, 984 (Vt. 1983).

Quantum meruit in particular "is based on the promise implied by law to make fair compensation for beneficial services rendered and knowingly accepted." *Crawford v. Farrington*, No.

2011-131, 2011 WL 4974841, at *2 (Vt. Sept. 1, 2011).  Damages
are the reasonable value of plaintiff's services regardless of
their value to defendant.  *In re Estate of Elliott*, 542 A.2d
282, 286 n.2 (Vt. 1988).

Here Cressy clearly rendered beneficial services to Proctor
through his work for Synergy.  While initially he might have
acted as a volunteer deserving no compensation, by 1994 the
nature of his participation in the business changed and he
became a full-time employee.  Proctor accepted the benefit of
Cressy's professional services for many years and never told
Cressy to stop working.  By the time the two reached Vermont
Cressy ran much of Synergy's day-to-day operations.  In fact,
Proctor acknowledged that he depended on his help when his
father became ill.

Proctor has significant assets in excess of $1 million that
were purchased mainly with Synergy profits.  The Court is
persuaded that it would be against equity and good conscience to
permit Proctor to retain the value of Cressy's labor for all of
the years that Cressy spent working for him.  To conclude
otherwise would render Cressy an indentured servant, which is
clearly inconsistent with how Cressy viewed his role and would
be contrary to what justice demands.  Cressy labored under an
expectation of receiving some benefit other than a roof over his

head and food in his belly and Proctor could not have run the business without him.

The professional aspect of the relationship is, in this case, entirely severable from the domestic aspects of the relationship. The Court has already held that household contributions cannot form the basis of Cressy's equitable claims. ECF No. 55 at 18. Any services Cressy performed on the farm or in the home are irrelevant to his quantum meruit claim for the value of his professional services to Synergy. Proctor relies on Restatement (Third) of Restitution and Unjust Enrichment § 28 (2011) ("Restatement") to argue that when unmarried cohabitants have a family relationship and one member of the couple is paying all or substantially all of the expenses of the other, their business relationship cannot be extracted from the familial and any equitable claim must therefore fail. Proctor suggests that Cressy's work should be presumed to have been performed gratuitously. However, this argument is not conclusive here because equity demands a case-specific inquiry and an assessment of the "totality of the circumstances" in each case. *Legault*, 459 A.2d at 984. Moreover, the Restatement itself acknowledges that in cases concerning unjust enrichment – the fraternal twin of quantum meruit - the facts of a particular case dictate the outcome. The Restatement goes so far as to note that "even where the claimant's contribution consists

primarily of domestic services, and even in a jurisdiction rejecting the possibility of status-based obligations between domestic partners" if the equities are sufficiently compelling the court will effect a division of assets. *Id.* In this case the equities are sufficiently compelling in Cressy's favor.

Moreover, while *Mitchell v. Moore*, 729 A.2d 1200 (Pa. Super. Ct. 1999) bears a superficial similarity to this case, its key facts are ultimately distinguishable. Moore and Mitchell were same sex partners who lived together on Moore's farm. Mitchell paid no rent but provided extensive labor and services on the farm and in their shared home. Mitchell helped run an antique cooperative that Mitchell had purchased but also had full-time employment elsewhere. The plaintiff's equitable claims, however, focused on his farm work. The additional work at the antique cooperative is mentioned only once in passing and is not central to the court's analysis, unlike the additional business relationship in this case. Moreover, evidence the court found "most potent" included Mitchell's statement in a letter to Moore that the time he had given Mitchell "breaking [his] back with the house and the grounds were just that, a gift to [their] relationship." *Id.* ¶ 16 (emphasis omitted). In the face of such a frank acknowledgement it was reasonable for the Pennsylvania Superior Court to conclude that the services rendered in this unmarried couple's relationship were

presumptively gratuitous.  The "services provided by the plaintiff to the defendant [were] not of the type for which one would normally expect to be paid."  *Id.* ¶ 17.

The facts before the Court are very different.  It is true that Cressy performed farm chores and household duties, which the Court very well may assume were performed gratuitously within a family unit.  However, Cressy also performed significant professional services at Synergy separate from the couple's domestic economy for which he would normally expect to be paid.  Cressy did not believe that he was working for Synergy as a "gift" to his relationship with Proctor.  Nor in his mind did he view his contribution as volunteer work.  Rather Cressy believed that he was entitled to one half of all of Proctor's assets.  The services Cressy provided were very different from those Mitchell provided to Moore's farm or those Cressy himself performed on Proctor's farm.  The Vermont Supreme Court has previously found support for one member of an unmarried couple's claim in quantum meruit for full-time professional services outside of the home.  *See Harman v. Rogers*, 510 A.2d 161, 165 (Vt. 1986) (remanding for trial court to consider quantum meruit claim of unmarried plaintiff who ran the day-to-day operations of the defendant's store full time for six months).

Finding Cressy has established his claim for quantum meruit by a preponderance of the evidence, the Court must measure the

25

reasonable value of the services Cressy provided regardless of
their value to Proctor.  *Elliott*, 542 A.2d at 286 n.2

Proctor argues that because he spent a significant amount
of money on trips, clothes, and other personal expenses for
Cressy, the Court should take these items into account and
offset any award.  Proctor's claimed offset applies only to the
years after Synergy closed but the couple remained together,
2008 to 2012.  Both parties and the Court agree that there can
be no claim for household services between domestic partners.
By the same token there can be no claim for household benefits
conferred on a domestic partner.  Proctor's asserted offset for
Cressy's personal expenses is effectively a claim for household
benefits that he provided to Cressy after the business closed.
If the Court were to take into account the household benefits
Proctor conferred it would also have to take into account the
household services Cressy performed and weigh them against each
other.  Aside from the fact the Court has no way to quantify
either, neither is relevant to the reasonable value of
professional services Cressy performed for Synergy.

Cressy's economic expert, Richard Heaps, calculated
Cressy's damages using two different figures for Cressy's
salary: $40,000 and $30,000.  Mr. Heaps testified that the
$40,000 wage was consistent with first line supervisors of
administrative workers.  The $30,000 figure represented the

portion of Janet Morrison's salary that was not commissions. Mr. Heaps testified that if the Court were to find that Cressy was self-directed and worked independently without supervision then the $40,000 figure would be an appropriate selection. The Court is persuaded that while Proctor was ultimately in charge, Cressy did not require significant daily supervision and typically worked independently. The Court will therefore use the $40,000 salary as its starting point.

Mr. Heaps then subtracted out what the amount of Cressy's living expenses would have been if he had purchased them out of his own wages during the period he worked for Synergy. Mr. Heaps concluded Cressy would have spent approximately 82% of his wages and would have had 18% left over for savings. Mr. Heaps noted that had Cressy been paid a market wage and spent that income in the manner that households typically do, he would have provided himself with the basic necessities of living and would have had money left over for other goods and services. Essentially Mr. Heaps calculated what Cressy lost: the ability to save a portion of the earnings he would have otherwise received during the years he worked for Synergy. The present value of Cressy's lost annual savings, including interest, added up to $173,685.

Accordingly, the Court finds in favor of Cressy on Count VI and awards him $173,685 in compensatory damages.

**D. Trust Claims (Count VII)**

The Court has already dismissed Cressy's express trust theory through summary judgment but Cressy's Complaint also raised other equitable theories of resulting and constructive trusts. Cressy contended that because the parties' accumulated wealth was intended to be shared equally, Cressy provided one half of the consideration for the purchase of the Ryegate properties and thus the court should find a resulting or constructive trust in order to return his interest him.

Counsel for Cressy conceded that the trust claims are "effectively derivative claims of the first two of our implied contract, promissory estoppel." ECF No. 93 at 9. The only way Cressy could succeed on a resulting or constructive trust claim was if Cressy's money was used to purchase property. In order for it to have been Cressy's money, Cressy must have succeeded on either his implied contract or promissory estoppel claim. *Id.* The Court has held above that Cressy has not met his burden of proving either. Therefore, the Court finds in favor of Proctor on Count VII.

**E. Affirmative Defenses**

Since the Court is inclined to grant Cressy equitable relief, the Court must also consider the affirmative defenses in equity Proctor contends bar Cressy's recovery. The Court concludes that none apply but will briefly examine Proctor's

principal defenses of laches, unclean hands, and estoppel by
acquiescence.

### 1. Laches

Laches is "the failure to assert a right for an
unreasonable and unexplained period of time when the delay has
been prejudicial to the adverse party, rendering it inequitable
to enforce the right." *Chittenden v. Waterbury Center Community
Church, Inc.*, 726 A.2d 20, 30 (Vt. 1998) (quoting *In re Vermont
Elec. Coop.*, 687 A.2d 883, 884-85 (Vt. 1994)). Proctor argues
that Cressy should have asked Proctor to put money aside for him
earlier than their breakup. Cressy honestly believed that he
and Proctor were on the same page and that it was "understood"
that he would receive half of Synergy's profits. While that may
not have been the actual agreement between the parties, Cressy
had no reason to raise his concerns earlier because they were
not relevant until the couple ended their relationship.
Moreover, it is clear that Proctor was the dominant and
controlling force and Cressy was loathe to confront Proctor
about their financial situation for fear of the conflict that
might result. Cressy has not failed to assert his right for an
unreasonable or unexplained period of time. Therefore the Court
will not apply the doctrine of laches.

## 2. Unclean Hands

Proctor next alleges that Cressy has come to the Court with unclean hands.  This doctrine is guided by the maxim that, "he who comes into equity must come with clean hands." *Starr Farm Beach Campowners Ass'n, Inc. v. Boylan*, 174 Vt. 503, 506, 811 A.2d 155, 160 (2002) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945)).  "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim . . . ." *Id.*

Proctor argues that Cressy has unclean hands because he might gain a substantial tax benefit by not receiving a contemporaneous salary.  There is no authority supporting an argument that a potential tax benefit represents a transgression of equitable standards in the absence of evidence that Cressy intentionally sought to avoid paying taxes.  There is simply not enough evidence to support a finding that Cressy aided Proctor in underreporting his income specifically to avoid nearly two decades worth of income and payroll taxes.  The Court has already concluded that the relative merits of each party's arguments regarding taxes are speculative and irrelevant. Cressy will pay taxes on his award now and, according to Mr. Heaps, he might even end up paying more by receiving a lump sum

than if he had received a contemporaneous salary.  Even if
Cressy were to end up ahead, a potential tax gain does not leave
Cressy with unclean hands.  It would be far more inequitable to
permit Proctor to retain the benefit of Cressy's work without
any compensation.  Thus the Court will not apply an unclean
hands defense.

### 3. Estoppel by Acquiescence

Estoppel by acquiescence arises when "the party being
estopped is silent in face of a duty to speak." *Beebe v.
Eisemann*, 2012 VT 40 ¶ 17.  The Vermont Supreme Court has
described this type of claim as a subspecies of the general
estoppel doctrine.  *Id.* ¶ 18.  The only portion of Proctor's
estoppel argument that applies to Cressy's quantum meruit claim
is his contention that Cressy had a duty to speak up about his
expectation of payment sooner than at the time of the couple's
break up.  For the same reasons described above in the context
of laches, Cressy is not estopped from bringing his quantum
meruit claim now because he had no notice that Proctor did not
actually consider him a partner until after their personal
relationship ended.  Neither Cressy nor Proctor sought outside
work after the close of Synergy and the domestic life of the
parties after 2008 is not relevant to Cressy's quantum meruit
claim.  The Court does not find Cressy is estopped from bringing
this claim.

**F. Proctor's Counterclaims**

Proctor brought three counterclaims against Cressy. The first relates to a painting described in his Answer as a "California Pleine-Aire mountain landscape, on board, in its original copper-washed wooden carved frame by Dr. Peder Sather Bruguiere." ECF No. 12 at ¶ 70. Proctor alleges that Cressy took the painting without permission at some point after their relationship ended. As described above, several months elapsed between the time Cressy left and Proctor's discovery that the painting was not where he thought it should be. There is simply no evidence that Cressy took the painting other than Proctor's general mistrust of Cressy in the wake of their break up. Therefore this counterclaim fails.

The second counterclaim alleges that Cressy took $400 set aside for the purchase of a headstone for Proctor's parents. At trial Proctor claimed the $400 was missing from a cache of money Proctor kept in his closet. Proctor never kept a record of how much cash was in his closet nor is there any evidence that Cressy knew about this cash. The Court is not persuaded that Cressy knowingly or maliciously took the money from Proctor.

Finally, Proctor raises a quantum meruit claim of his own. He claims that in the event the Court "finds as a matter of law an express agreement existed between Defendant and Plaintiff, as defendant provided Plaintiff . . . with room, board, clothing,

travel expenses, health insurance, recreational expenses, and other sundry goods, services, and provisions" Proctor is therefore entitled to restitution of the reasonable value of those benefits. ECF No. 12 at ¶ 82. The Court has found no such express agreement. Moreover, the Court has already concluded that it will not consider the domestic services and expenditures of each party because they are presumed to be gratuitous in a familial relationship and are entirely separate from Cressy's professional services. Even if the Court were to consider Proctor's claim, however, it would fail because Cressy has not proven the amount of his damages.

Accordingly, the Court finds in favor of Cressy on all three of Proctor's counterclaims.

### G. Spoliation

Finally, there is one outstanding motion that the Court has yet to rule on. Shortly before trial Cressy filed a Motion *in Limine* Regarding Spoliation. ECF No. 83. During discovery Cressy requested complete financial records for both Synergy and Proctor but some were missing. Proctor contended that financial records were destroyed in the Sunnyside fire. Cressy claims these records were not stored in Sunnyside but rather in the office or the main barn. If the Court were to agree with Cressy that Proctor had willfully withheld or destroyed requested documents then Cressy would be entitled to an adverse inference.

The Court is persuaded, however, that Synergy financial records were in fact destroyed in the Sunnyside fire. Ms. Flax testified that Proctor told her the records were burned in the fire before any motive to conceal unfavorable financial records might have arisen. The Court found this testimony credible. Ms. Flax's account was further confirmed by testimony from Proctor himself that he had moved the records to Sunnyside, similar testimony from Ms. Proctor Riley that he done so, and testimony from an H&R Block employee, Elizabeth Legendre, that Proctor told her that his financial records had burned. Others observed him performing work consistent with an ability to move the boxes despite any previous back injuries.

In short the Court is not persuaded that Proctor has engaged in any wrongdoing. The Court made no adverse inference against Proctor and Cressy's motion is therefore **denied**.

### Conclusion

For the reasons set forth above the Court finds in favor of Cressy on his quantum meruit claim and awards him $173,685. The Court also finds in favor of Cressy with respect to all of Proctor's counterclaims. The Court finds in Proctor's favor on all other outstanding issues and claims. The Court will enter judgment consistent with its findings of fact and conclusions of law.

DATED at Burlington, in the District of Vermont, this 4th day of August, 2015.

/s/William K. Sessions III
William K. Sessions III
District Court Judge